## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC.,

     Plaintiff

     v.                                                                                                     Civil Action No. 11-1152 (AK)

UNITED STATES DEPARTMENT OF
STATE,

     Defendant.

## <u>MEMORANDUM OPINION</u>

Plaintiff, Judicial Watch, Inc. ("Judicial Watch") brings this action pursuant to the

Freedom of Information Act ("FOIA") 5 U.S.C. § 522 *et seq*., to compel Defendant, the United

States Department of State ("the Department") to disclose certain records.  This matter is before

the court on the Department's Motion for Summary Judgment ("Def.'s Mot.").  Defendant filed a

declaration by Ms. Sheryl Walter to support its Motion.  ("Decl. of Sheryl Walter")  Plaintiff

submitted an Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp."), and

Defendant replied ("Def.'s Reply").  For the reasons set forth below, the undersigned hereby

orders that the Department's Motion be granted.

## I. BACKGROUND

Plaintiff Judicial Watch filed a request for documents pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, with Defendant, the Department, on February 7, 2011. (Def.'s Mot., Ex. 1.) In its request, Judicial Watch sought records of any contact between the Department and a lobbyist for Transcanada Pipelines ("Transcanada") named Paul Elliott pertaining to the Keystone XL pipeline. (*Id.*; Pl.'s Opp. at 2.) Transcanada is the would-be builder of the pipeline. (Pl.'s Opp. at 1.) Judicial Watch filed the request to determine the extent of Mr. Elliott's involvement during the deliberations on the licensing for the pipeline within the Department. (*Id*. at 3.)

The Keystone XL pipeline is a proposed oil pipeline coming from Canada, running through the United States to Texas.[1] The licensing and development of the Pipeline are politically charged issues. (Def.'s Reply at 3; Pl.'s Opp. at 9.) Mr. Elliott, a former deputy campaign manager for Secretary of State Hillary Clinton, now works for Transcanada. (Pl.'s Opp. at 2.) According to Judicial Watch, Mr. Elliott has "aggressively lobbied Defendant to authorize construction of Keystone XL." (Pl.'s Opp. at 3.)

Currently, the final authorization status of the Pipeline is undetermined. The Department denied Transcanada authorization to build the pipeline on January, 18, 2012. (*Id.* at 2.) However, concurrent with its denial, the Department also invited Transcanada to reapply for authorization. (*Id.*)

Judicial Watch filed this lawsuit against the Department on June 22, 2011 after receiving no response to its request. (Pl.'s Opp. at 3.) Over a series of letters following the filing of the

---

[1]*See* http://www.transcanada.com/5730.

suit, the Department updated Judicial Watch on the progress of the search for relevant

documents.  (Def.'s Stmt. of Material Facts at ¶¶ 1-8; Decl. of Sheryl Walter ¶¶ 4-10.)  In

addition to these letters, the Department released responsive documents to Judicial Watch on an

ongoing basis.  (Def.'s Stmt. of Material Facts at ¶¶ 1-8; Decl. of Sheryl Walter ¶¶ 4-10.)

Judicial Watch does not challenge the extent of the Department's search.  (Joint Pre-Trial

Statement.)

 The lone items remaining for consideration on these motions are several names in a single

document identified as Document W52.  (Pl.'s Opp. at 9.)  The Department has provided a

declaration by Ms. Sheryl Walter to support its use of the Exemptions.  (*See* Decl. of Sheryl

Walter)  Document W52 is a chain of 12 emails that were exchanged over 17 days where

members of government agencies, including the Department, discuss potential attendees for an

upcoming meeting.  (*See* Def.'s Reply, Ex. 1.)  The meeting, set to take place on February 7,

2011, was to gather representatives from Canadian and United States agencies and other

individuals to discuss the pipeline.  (*See* Decl. of Sheryl Walter at ¶ 14.)  In Document W52, the

meeting is described as "that Washington briefing on regulatory process for Canadian business

groups."  (Def.'s Reply, Ex. 1. at 6.)  In her declaration, Ms. Walter describes the meeting as "a

briefing on regulatory cooperation."  (Decl. of Sheryl Walter at ¶ 20.)

 The withheld names occur in several portions of the relevant emails.  (Def.'s Reply, Ex.

1.)  The Department withholds lists of names of potential attendees for a meeting under

Exemptions 5 and 6.  (Def.'s Mot. at 7; Decl. of Sheryl Walter at ¶¶ 14-15. )  These lists of

names appear in the text of the emails with headers such as, "US Participants," "Canadian

Participants," "Treasury Board," and "Also."  (Def.'s Reply, Ex. 1.)  Suggestions for attendees

come from the "CABC," the U.S. Embassy in Ottawa, and the Canadian Embassy in

Washington, D.C., among others.  (*Id.* at 1-2.)  Under only Exemption 6, The Department also

redacted the names of two members of the National Security Staff who are authors and recipients

of several emails in the chain.  (Pl.'s Opp. at 3, 9; Def.'s Reply, Ex.1.)  These two names appear

in the "to," "from," and "cc" lines of emails, as well as in the signature blocks.  (*Id.*)  Judicial

Watch is not requesting the release of several phone numbers that are also withheld.  (Pl.'s Opp.

at 9.)  The Department has released all other documents to Judicial Watch's satisfaction.  (*Id.*)

## II. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where the

documents in the record show no dispute as to any material fact and the movant is entitled to

judgment as a matter of law.  Fed. R. Civ. P. 56(a), (c).  In ruling on a motion for summary

judgment, the court must draw all justifiable inferences in the nonmoving party's favor and

accept the nonmoving party's evidence as true.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

252, 106 S. Ct. 2505 (1986).  The nonmoving party, however, must establish more than "the

mere existence of a scintilla of evidence" in support of its position.  *Id*.

"FOIA cases are typically and appropriately decided on motions for summary judgment."

*Moore v. Bush*, 601 F. Supp. 2d 6, 12 (D.D.C. 2009).  "Summary judgment is warranted on the

basis of agency affidavits when the affidavits describe the justifications for nondisclosure with

reasonably specific detail, demonstrate that the information withheld logically falls within the

claimed exemption, and are not controverted by either contrary evidence in the record, nor by

evidence of agency bad faith."  *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)

(quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984)).

### III. ANALYSIS

The Department claims Exemptions 5 and 6 to withhold the lists of names, and
Exemption 6 alone to withhold two White House Security Staff personnel sending and receiving
emails.  (Decl. of Sheryl Walter at ¶ 20.)  The undersigned considers Exemption 5 first as it is the
more narrowly asserted of the two exemptions.

### A. FOIA Exemption 5

Exemption 5 protects "inter-agency or intra-agency memoranda which would not be
available by law to a party other than an agency in litigation with the agency." 5 U.S.C. §
552(b)(5).  The Exemption incorporates three privileges: attorney work product privilege,
attorney-client privilege, and "deliberative process" privilege.  *See Coastal States Gas Corp. v.
U.S. Dep't of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980).  The Department claims the
"deliberative process" privilege for Document W52.  (Def.'s Reply, Ex. 1.)  The agency has the
burden of showing that the information may be withheld under the Exemption.  *See Coastal
States Gas Corp.,* 617 F.2d at 866.

The deliberative process privilege, like the other privileges within Exemption 5, exists to
(1) protect agency employees providing analysis and opinions to superiors; (2) protect against
premature disclosure of policies; and (3) protect the public from the confusion of viewing
preliminary and potentially inaccurate rationales for eventual agency action.  *See Russell v. Dep't
of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982); *Coastal States Gas Corp.*, 617 F.2d at
156.  In so doing, the deliberative process privilege "prevent[s] injury to the quality of agency
decisions."  *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151, 95 S.Ct. 1504, 1516 (1987).

Where agency employees fear disclosure of their intra or inter-agency discussions, a "chilling effect" is created that injures agency decision-making. *Judicial Watch, Inc. v. U.S. Dep't of the Treasury*, 796 F. Supp. 2d 13, 27 (D.D.C. 2011).

In order to qualify for exemption under the deliberative process privilege, the withheld information must be both pre-decisional and deliberative. *Coastal States Gas Corp.*, 617 F.2d at 866. "In determining whether a document is predecisional, an agency does not necessarily have to point specifically to a final decision, but need only establish 'what deliberative-process is involved, and the role played by the documents in issue in the course of that process.'" *Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec.*, 384 F. Supp. 2d 100, 112 (D.D.C. 2005) (quoting *Coastal States Gas Corp.*, 617 F.2d at 868). In determining whether withheld information is deliberative, courts consider whether the information was purely factual or "whether it reflects the give-and-take of the consultative process." *Coastal States Gas Corp.*, 617 F.2d at 866. Purely factual information is not protected by the Exemption because it would generally be available through discovery and would not call into question agency discussion. *See e.g., EPA v. Mink*, 410 U.S. 73, 91, 93 S.Ct. 827, 838 (1973). Because the release of purely factual information is disconnected from the deliberative process, it generally "would not threaten agency deliberations." *Public Citizen v. U.S. Dep't of State*, No. 91-cv-746, 1991 WL 179116, at *4 (D.D.C. Aug. 27, 1991) (citing *Montrose Chem. Corp. v. Train*, 491 F.2d 63, 66 (D.C. Cir. 1974).

This Court has upheld agency decisions to withhold portions of an email chain under the Exemption. *United Am. Fin., Inc. v. Potter*, 667 F. Supp. 2d 49, 66 (D.D.C. 2009). In *Potter*, the U.S. Postal Service withheld an email discussion focused on contacts within an insurance

company in connection with a fraud case.  *Id.*  According to a supporting affidavit and the context provided by the emails, a postal inspector made "speculative statements" in an email related to insurance company contacts and the fraud case.  *Id.*  The court held that the redacted discussions of contacts were properly withheld because the "speculative statements" were deliberative and, therefore, covered by the Exemption.  *Id.*

In *Citizens for Responsibility and Ethics in Washington*, ("CREW"), the court conducted an *in camera* review of several documents the agency withheld under Exemption 5.  *CREW v. U.S. Dept. of Homeland Sec.*, 648 F. Supp. 2d 152, 157-161 (D.D.C. 2009).  Many of the documents, requested to identify influence in agency decision-making regarding a border fence, were not deliberative because the "material [did] not reflect the 'personal opinions of the writer,' nor [was] it 'so candid or personal in nature that public disclosure is likely in the future to stifle honest and frank communication within the agency.'"  *Id.* at 159 (quoting *Coastal States Gas Corp.*, 617 F.2d at 866).  The court said that purely factual information, such as assigning a task to a subordinate, would have no chilling effect if disclosed because it merely identified a factual matter, who would perform a set task.  *CREW*, 648 F. Supp. 2d at 160.  In another email chain, however, one agency employee wrote about the agency's "formulation of the agency's substantive response" to allegations.  *Id*. at 162.  The court held that this email was properly withheld under the Exemption because the author gave a "personal opinion" and disclosure would chill agency action by discouraging "honest and frank communication."  *Id.*

In this case,  the parties agree that the emails are pre-decisional.  (Pl.'s Opp. at 6-7.)  The emails and meeting predated the denial of authorization to build the pipeline by the Department to Transcanada.  *Id.*  The parties disagree about whether the withheld names represent any

deliberative act by the Department of State.  (*Id.* at 7.)  Judicial Watch argues that the withheld names of potential meeting attendees in Document W52 are "primarily factual material and do[] not appear to be intertwined with any deliberative material . . . ."  (*Id.*)

The Department, on the other hand, argues that the names it has withheld from Document W52 represent inter-agency deliberation about who should attend the meeting.  (Def.'s Mot. at 7; Def.'s Reply at 2.)  According to the Department, releasing the names of the people being considered to attend the meeting would injure the ability of the Department and the other organizations to consult freely.  (Def.'s Mot. at 7.)  The Department cites several portions of the chain to support its argument.  In a January 20, 2012 email, the author recommends an employee of the Treasury board of Canada be added to the list of possible attendees.  (Def.'s Reply, Ex. 1 at 2.)  The author of the email also states that "OIRA will defer to [the National Security Staff] and the Post [or Embassy] on the final list of invitees."  (*Id.*)  Other emails show the parties exchanging lists and expressions of interest, but never providing a final authoritative list of persons attending the meeting.  (*Id.*)

In the emails, the withheld names are not purely factual information because the agencies are in the process of deciding who will attend the meeting.  The emails do not merely state a confirmed list of attendees, but rather a series of views and opinions on the potential attendees. Here, the presence or absence of a name conveys an agency or employee's opinion about a potential attendee's value to the meeting.  The Department has adequately shown the deliberation that was occurring between the agencies.  Multiple agency representatives offer recommendations on behalf of their agency or their Canadian counterparts.  (*Id.* at 1-2.)  The email authors also suggest that they will defer to other agencies for final determinations.  (*Id.* at

2.)  In this way, the conversational, back-and-forth discussion between agency employees debating who they thought should attend is most akin to the "speculative" discussion of the fraud case and insurance company contacts in *Potter*.  667 F. Supp. 2d at 66.

Disclosure of potential invitees would also have a chilling effect on the sort of inter-agency discussions taking place in these emails.  Disclosing these discussions in full would likely have the effect of forcing agency employees to question whether to express opinions about who should attend a meeting.  However, the meeting and the discussion of who would attend are part of the deliberative process of the pipeline's authorization.

Given that the lists of names withheld by the Department pursuant to Exemption 5 were both pre-decisional and deliberative, and that disclosure would chill similar inter-agency communications in the future, the material has been properly withheld pursuant to Exemption 5.

**B. FOIA Exemption 6**

Because the Department can invoke Exemption 5 to withhold the lists of names in the text of the emails, the only names remaining for review under Exemption 6 are the two White House Security Staff persons sending and receiving several emails.

1. Legal Standard for Exemption 6

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. 552(b)(6). Exemption 6's "presumption in favor of disclosure is as strong as can be found anywhere in the Act."  *Nat'l Ass'n of Homebuilders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002) (citing *Wash. Post Co. v. U.S. Dep't of Health & Human Servs.*, 690 F.2d 252, 261 (D.C. Cir. 1982)).  If the withheld document fits one of the three categories of personal, medical, or similar files, the court

must apply a balancing test to weigh the individual's privacy interest against the public interest in disclosure. *See ACLU v. DOJ*, 655 F.3d 1, 12 (D.C. Cir. 2011). The protected information need not be entire physical files, but may merely be "bits of personal information." *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 152 (D.C. Cir. 2006).

First, the file must be identified as the type considered by the statute. "[T]he Supreme Court has interpreted the phrase, 'similar files' to include all information that applies to a particular individual." *Lepelletier v. FDIC*, 164 F.3d 37, 46 (D.C. Cir. 1999) (quoting *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602, 102 S.Ct. 1957, 1962 (1982)). The term "similar files" is to be construed broadly to cover detailed government records on a specific person. *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602, 102 S.Ct. 1957, 1961 (1982). However, files containing private information on multiple individuals may also be protected. *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 152 (D.C. Cir. 2006).

Next, the agency has the burden of showing that the intrusion into individuals' personal privacy is clearly unwarranted for the Exemption 6 balancing test. *Lepelletier*, 164 F.3d at 46. An initial determination must be made identifying the privacy interest as substantial or *de minimis*. *Multi Ag Media LLC v. USDA*, 515 F.3d 1225, 1229 (D.C. Cir. 1981). A substantial privacy interest exists in avoiding embarrassment, retaliation, or harassment and intense scrutiny by the media that would likely follow disclosure. *U.S. Dep't of State v. Ray*, 502 U.S. 164, 176 n.12 (1991); *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 167 (2004).

The burden then shifts to the requester to identify the public interest in disclosure. *Carter v. U.S. Dep't of Commerce*, 830 F.2d 388, 391 (D.C. Cir. 1987). FOIA exists "to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire &*

*Rubber Co.*, 437 U.S. 214 (1978).  To that end, "the only relevant public interest in the FOIA

balancing analysis [is] the extent to which disclosure of the information sought would 'she[d]

light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their

government is up to.'" *Lepelletier*, 164 F.3d at 47 (quoting *U.S. Dep't of Def. v. Fed. Labor

Relations Auth.*, 510 U.S. 487, 497 (1994)) (alterations in original).

    After the public and private interests have been identified, and the private interest has

been characterized as substantial, the two factors are weighed to determine whether the

information should be released because the intrusion is "clearly unwarranted."  *See, e.g. Ray*, 502

U.S. at 176 n.12, 112 S. Ct. 541, 548 (1991).  The "clearly unwarranted" language creates a

heavy burden for the agency.  *Morley v. CIA*, 508 F.3d 1108, 1127 (D.C. Cir. 2007).

    2. Document W52 as a 'Similar File'

    The email chain in Document W52 is a similar file within the understanding of the Act.

Although comprised of emails about numerous individuals, Document W52 contains sufficient

personal information to qualify under the Exemption.  Courts have considered emails and

correspondence files "similar files" in recent years. *Judicial Watch, Inc. v. FDA*, 449 F.3d 141,

152 (D.C. Cir. 2006) (agency decision to withhold names and addresses of doctors from assorted

documents was upheld); *Lewis v. DOJ*, No. 09-cv-0746, 2011 WL 5222896 (D.D.C. Nov. 2,

2011) (agency decision to withhold names from correspondence files was upheld).  The emails

here, which contain names, titles, offices and phone numbers, qualify as similar files because

they contain personal information about the named government personnel.

3. The Privacy Interest

The two White House Security Staff personnel have a legitimate interest in avoiding disclosure of their names because it would likely subject them to intense media scrutiny.

The Department alleges in its motion that "the release of this information could expose the staffers to possible harassment and undesired contact by media, and others seeking to gain information about the deliberative process in this matter." (Def.'s Mot. at 9.)  Judicial Watch suggests that this interest is *de minimis*. (Pl.'s Opp. at 8-9.)  However, Judicial Watch offers no evidence to support that suggestion. (Def.'s Reply at 2; Pl.'s Opp. at 8-9.)  The parties agree that there is already intense public scrutiny of the Keystone XL Pipeline and that disclosures will likely increase this scrutiny. (Def.'s Reply at 3; Pl.'s Opp. at 9.)

There is a substantial interest in bits of personal information where there is a justified and articulable risk of media harassment. *See e.g., Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 384 F. Supp. 2d 100, 118 (D.D.C. 2005) (withholding of employee names upheld where media scrutiny and harassment were likely).  The risk of media harassment and undesired contact for these two individuals is substantial and not *de minimis*.  The issue of the Keystone XL Pipeline continues to receive substantial press coverage.[2]  While lobbyists like Mr. Elliott may be prepared to weather intense media attention, the same may not necessarily be said for the White House Security Staff.  Disclosure here would likely lead to the publication of

---

[2]For two examples, *See* Juliet Elperin and Steve Mufson, *Transcanada Pipeline Lobbyist Works All the Angles With Former Colleagues*, The Washington Post, September 2, 2011; *See* Elisabeth Rosenthal, *Pipeline Foes See U.S. Bias in Emails*, The New York Times, October 3, 2011.

individuals' names and intrusion from media or others seeking information about the pipeline and the process.

### 4. The Public Interest

The court considers the broad public interest in the disclosure of the two remaining names.  The public has a general interest in understanding how the Department reached its February 2012 denial of authorization of the pipeline and invitation to Transcanada to reapply.  Judicial Watch argues a more narrow, specific interest in disclosure.

Judicial Watch appears to argue that the general public has an interest in knowing whether Mr. Elliott had access to the meeting, or the extent of his involvement from the names of other participants.  (Pl.'s Opp. at 8-9.)  The Department, for its part, argues that there is no public interest in the names because they represent a list under consideration, and not a final list of who was able to attend.  (Def.'s Reply at 3.)

The public interest in understanding this particular agency action, and the process behind it, is evidenced by the media attention.  Learning who was involved in the planning of this meeting would provide insight into the authorization process.  The public would better understand the agency's decision-making process by learning the names of individuals who recommended possible attendees.  However, the Department has disclosed most of the responsive emails.  The staffers' titles, offices, and text of emails minus the recommended attendees have all been disclosed.  The public interest in the names of the two staffers is low because their involvement, and that of their offices, have been substantially disclosed.

5. The Balancing Test

After weighing the two competing interests, the undersigned finds that the agency has

satisfied its burden of showing that the intrusion on the two unnamed staffers would be "clearly

unwarranted."  Two cases, including one involving the plaintiff, are instructive.

This Court has allowed names to be withheld under Exemption 6 when a substantial risk

of harassment by media outweighed a small public interest.  *Elec. Privacy Info. Ctr. v. U.S. Dep't*

*of Homeland Sec.*, 384 F. Supp. 2d 100, 118 (D.D.C. 2005).  In that case, the plaintiff contested

the disclosure of the names of lower-level Transportation Security Administration agents and

Department of Homeland Security personnel contained in documents requested following a

controversial release of airline passenger information.  *Id.* at 104-105.  The initial information

release led to increased scrutiny of the agencies and airlines by news organizations and civil

liberties groups.  *Id.*  Considering the privacy interest of the employees, the likelihood that the

names would be published, and the public scrutiny following the first release, the court

concluded that the employees would be sought out for further information.  *Id*. at 117.  On the

public interest side of the balancing test, the court said that disclosing the names of "lower-

echelon employees" would not shed any light on the agencies actions.  *Id.*  The court concluded

after balancing the two interests that the employees names were properly withheld from the

responsive document.

In *Judicial Watch v. FDA*, Judicial Watch sought information regarding the FDA's

decision making process for RU-486, the "medical abortion drug." 449 F.3d at 144.   Among

other things, Judicial Watch sought the names of individuals who had worked on the pill's

production.  *Id.* at 152.  The privacy interest cited by the agency to justify withholding the names

was the risk of abortion-related violence. *Id.* The court found no public interest in the names. *Id.* The appellate court upheld the trial court's determination that the contested names and addresses were properly withheld from records containing information on multiple individuals, citing the risk of violence and supporting affidavits. *Id.*

The general public interest in understanding the government's method during the authorization process would not be further served by learning the names of two White House staff members. Although there is no threat of violence as in *Judicial Watch v. FDA*, the risk of harassment outweighs the modest public interest in the staffers' names. As redacted, the emails describe the extent of the individuals' involvement without subjecting them to harassment. The White House Security Staff's involvement in the decision-making process is already apparent. Disclosing the names of two staffers, where the format and nature of their involvement have already been disclosed would accomplish little for the public interest. The risk of intrusion on the two remaining individuals' privacy is too high, and "clearly unwarranted" given the context provided by the Department.

### C. Segregability

After an agency redacts the exempted information, it must release any reasonably segregable information "unless the non-exempt information is inextricably intertwined with the exempt information." *Trans-Pac. Policing Agmt. v. U.S. Customs Serv.*, 177 F.3d 1022, 1027 (D.C. Cir. 1999) (quoting *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977)). A court must consider the segregability issue, even *sua sponte*. *Trans-Pac. Policing Agmt.*, 177 F.3d at 1028.

The Department of State asserts that it has released all relevant and segregable information from Document W52.  (Def.'s Mot. at 9-10.)  Judicial Watch argues that the names should be released, but has no interest in the telephone numbers.  (Pl.'s Opp. at 9.)  Therefore, the parties only disagree on the withheld names.

Given that the Department appropriately withheld the names under the relevant exemptions, and that Judicial Watch now seeks only those names, all reasonably segregable information has already been disclosed.

## IV. CONCLUSION

For the foregoing reasons, the undersigned orders that the Defendant's Motion for Summary Judgment will be granted.  A separate order will accompany this memorandum opinion.

Date: July 12, 2012                                     _____/s/_____
                                                        ALAN KAY
                                                        UNITED STATES MAGISTRATE JUDGE